## Affidavit Of Steven C. Story

I, Steven C. Story, on oath depose and state that:

1.    I am a Special Agent with the Drug Enforcement Administration ("DEA") and I have been so employed for approximately 17 years.  During the course of my career, I have received specialized narcotics training from DEA and I have been involved in over 400 narcotics investigations involving the use of various investigative techniques, including controlled purchases of narcotics, the use of confidential informants and other cooperators, physical surveillance, electronic surveillance, and financial investigations.  Since June 2003, I have been assigned to DEA's Mobile Enforcement Team, which has been conducting an investigation of certain narcotics dealers on the North Shore.

2.    Since March 2004, I have been involved in an investigation of **Adam Ellard ("Ellard")**, a 31-year old man who is originally from the North Shore area but who currently resides in the Dorchester section of Boston.  The information set forth in this affidavit is based on my personal participation in this investigation as well as on information provided to me by other DEA agents, law enforcement officers, and public and private databases.  I am submitting this affidavit to establish probable cause that, on or about April 12, 2004, Ellard and the other defendants named in this affidavit conspired with each other to distribute cocaine base, also known as "crack" cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846.  Accordingly, I have not included each and every fact known to me as a result of my participation in this investigation.

### Controlled Purchase Of Vicodin From Ellard

3.    On the night of March 2, 2004, a DEA undercover agent ("UCA") met with a female resident of Gloucester, Massachusetts and negotiated the purchase of 1,000 Vicodin tablets and a half-ounce of crack cocaine.  This meeting, which was recorded and surveilled by DEA agents, took place in Gloucester.  During the meeting, the female stated that her Vicodin source of supply would be bringing her the tablets the next morning.  The female agreed to sell the UCA the Vicodin for $6.75 per tablet and the half-ounce of crack cocaine for $750.  I am aware that Vicodin is a Schedule III controlled substance.

4.    On the morning of March 3, 2004, the UCA called the female, who stated that she had not heard from her source of supply yet.  Shortly thereafter, a male who identified himself as "Alex" called the UCA and indicated that he was the female's

source.  After questioning the UCA about the UCA's background,
"Alex" stated that he had not brought the Vicodin tablets to
Gloucester the night before because he did not know the people
with whom the female was dealing.  "Alex" then stated that he
would prefer to deal directly with the UCA, rather than going
through the female in Gloucester, and that the UCA could obtain
lower prices by dealing directly with him.  "Alex" then proceeded
to negotiate prices for both the Vicodin tablets ($6.40 per
tablet) and the crack cocaine with the UCA ($625 for a half-
ounce).  "Alex" agreed to meet the UCA in the Revere area to do
the deal, stating that he was like "one-stop shopping," that he
could get anything the UCA wanted, and that his crack cocaine was
the best around.  As set forth more fully below, "Alex" was
identified during the course of this investigation as **Ellard.**

        5.    On March 3, 2004, the UCA had a consensually-recorded
telephone conversation with Ellard, who stated that he had not
had time to cook the crack cocaine and that the Vicodin tablets
were not in the original pharmaceutical bottles, adding that
people do not like the tablets in bottles because the bottles are
"ten years each" (i.e., ten years' imprisonment if caught with
them).  The UCA indicated that he would purchase the Vicodin
tablets and that he would purchase the crack cocaine at a later
date.  In subsequent consensually-recorded telephone
conversations on March 3, the UCA agreed to meet Ellard in the
parking lot of the Northgate Shopping Center in Revere.

        6.    On the afternoon of March 3, 2004, the UCA and a second
DEA undercover agent ("UCA-2") met with Ellard inside a Pizzeria
Uno restaurant.  Ellard was accompanied by another male.  Ellard
introduced himself to the UCA, stating that "my name is Adam, not
Alex, and this is my partner Troy" (referring to the other male).
During the ensuing meeting inside the restaurant, Ellard stated
that he had been in the drug business for 13 years, that doing
business with him would be laid back and easy, and that his
prices and quality were the best around.  Ellard also mentioned
that he had been arrested a few years earlier after a police raid
on his house because he was "set up" by his best friend at the
time.  This meeting was recorded and surveilled by DEA agents.

        7.    After a while, Ellard and the UCA went outside to the
parking lot, where Ellard directed the UCA to a parked Toyota 4-
Runner, which was occupied by another male.  Ellard introduced
the UCA to this male, stating that the male was his "runner" in
drug deals, and he negotiated with the UCA over the logistics of
the Vicodin deal.  After this conversation, Ellard handed money
to the "runner" and instructed him to go get half of the Vicodin
pills.  The "runner" drove away while Ellard and the UCA returned

2

to the restaurant and re-joined UCA-2 and the other male.

8.    Once they returned to the restaurant, Ellard and the UCA negotiated extensively for a future purchase of a minimum of 1,000 ecstasy pills, with Ellard stating that he can obtain the pills in lots of one thousand.  During this conversation, Ellard stated that he does things carefully because if he gets arrested again, he will go to jail for life.  Ellard further stated that he plans to deal heavy for approximately six months and then go to Florida with $250,000-$300,000 in his pocket. Ellard also stated that he makes "three-four grand" per week for doing absolutely nothing.

9.    After this conversation, all four persons walked outside to the parking lot, where the same Toyota 4-Runner was observed by agents returning to the lot.  Shortly thereafter, the UCA retrieved $3,200 in cash from another DEA undercover agent ("UCA-3"), who drove into the lot.  Shortly thereafter, the UCA went to the Toyota 4-Runner, where Ellard sold the UCA 500 Vicodin tablets for the cash.  After this first half of the deal, the UCA and UCA-2 followed the Toyota 4-Runner, which contained the "runner" and Ellard, to a nearby location in Revere.  While the "runner" drove away to get the additional Vicodin pills, Ellard, the UCA, and UCA-2 waited.  After the Toyota 4-Runner returned, Ellard sold the UCA another 500 Vicodin pills for $3,200 in cash.  During this deal, Ellard stated that he would meet the UCA another time to sell him the crack cocaine, stating that it was the "best stuff, straight from fish scale" (i.e., high quality).  He also stated that he usually makes about $14,000 in "play money" in three-four weeks' time and that he can make $6,900 during a good week.

### Controlled Purchase Of Crack Cocaine From Ellard

10.    On March 8, 2004, the UCA had a consensually-recorded telephone conversation with Ellard concerning the purchase of the half-ounce of crack cocaine.  Ellard agreed to sell the UCA the half-ounce for $625, stating that his stuff was the best, that he baked all of his product home-made, and that he would bet his life on it.  They agreed to do the deal the following afternoon in the Dorchester section of Boston.

11.    On the afternoon of March 9, 2004, the UCA and UCA-2 met with Ellard inside a Home Depot store in the South Bay shopping center in Dorchester.  This meeting was recorded, videotaped, and surveilled by DEA agents.  Ellard proceeded to purchase a can of gold spray paint that he stated he needed for his house.  After leaving the store, Ellard directed them to a

blue GMC Sierra which Ellard claimed was his "new" truck.  After
their arrival at Ellard's truck, Ellard sold the UCA a plastic
bag of crack cocaine for $625 in cash.  Ellard also provided the
UCA with a sample of marijuana and stated that he would bring the
UCA a sample of "rolls" (ecstasy) the next time they met.  The
crack cocaine was field-tested, with a positive result for the
presence of cocaine.  It has been sent to a DEA laboratory for
further testing.

### Conspiracy On April 12, 2004

12.  On April 8, 2004, the UCA had consensually-recorded
telephone conversations with Ellard concerning a proposed
purchase of two ounces of crack cocaine from Ellard.  Ellard
quoted a price of $1,175 per ounce ($2,350 in total) and he
agreed to do the deal the following week.  Ellard stated that
this crack cocaine would be better quality than what the UCA
purchased on March 9.

13.  On April 12, 2004, the UCA had consensually-recorded
and unrecorded telephone conversations with Ellard concerning the
proposed deal.  After further negotiations, it was agreed that
the UCA would meet Ellard at about 5:00 p.m. in the parking lot
of a Bickford's restaurant near the South Bay shopping center in
Dorchester.

14.  At about 5:00 p.m. on April 12, 2004, the UCA drove to
the agreed-upon location and waited.  The UCA had a series of
unrecorded telephone conversations with Ellard, who stated that
he was waiting for his ride and then that he was on his way.  At
about 7:30 p.m., other DEA surveillance agents and I observed a
black Honda Civic and a silver Ford Focus driving in tandem to
the agreed-upon location.  I observed that Ellard was the front-
seat passenger in the Honda, which was being driven by another
male, who was later identified as **Willie Hester.**  I observed that
the Ford Focus contained a male driver, who was later identified
as **Tavon Robinson**, as well as a male front-seat passenger, who
was later identified as **Steven Tucker**, and a male back-seat
passenger, who was later identified as **Nelson Barnes.**  While the
Honda Civic was parked in the middle of the lot facing the UCA's
automobile, the Ford Focus was driven around the parking lot and
passed closely by the UCA's automobile.  The Ford Focus was then
parked in the lot facing in the opposite direction from the Honda
Civic.

15.  Ellard exited from the Honda Civic and entered the
automobile containing the UCA.  The UCA showed the money to
Ellard, who counted the money.  Ellard indicated that the crack

cocaine was in both cars – the Honda Civic in which he had arrived and the Ford Focus – while pointing out the Ford Focus to the UCA. Ellard and the UCA negotiated over whether Ellard could take half the money to the Ford Focus. The UCA declined to allow Ellard to take the money. This meeting was recorded and surveilled by DEA agents.

16. After this conversation, Ellard exited from the UCA's automobile and walked over to the driver's side of the Honda Civic. Ellard then had an extended conversation with **Hester,** who was sitting in the driver's seat of the Honda Civic. Other surveillance agents and I then observed Ellard walk over to the passenger side of the Ford Focus. Ellard leaned into the passenger side of this car and appeared to engage in conversation with **Robinson, Tucker, and Barnes.** After several minutes, Ellard returned to the UCA's automobile and he instructed the UCA to back up his automobile so that it would be directly behind the Ford Focus. The UCA did as instructed, with Ellard now sitting in the front passenger seat of the UCA's car.

17. After the UCA's automobile was moved next to the Ford Focus, Ellard again asked the UCA to give him the money so that Ellard could go the Ford Focus and obtain the crack cocaine. Ellard assured the UCA that the UCA could watch him do this and that the UCA would not lose his money. After the UCA refused to allow this to happen, Ellard exited from the UCA's car and walked over to the passenger side of the Ford Focus. Ellard again leaned into the passenger side of the Ford Focus and appeared to engage in conversation with all three occupants of the Ford Focus. After approximately two minutes, the UCA told Ellard that he was going to wait in another part of the parking lot. The UCA then parked in another nearby area.

18. Shortly thereafter, the UCA observed **Robinson** exit from the Ford Focus, partially open the hood of this car, and then close the hood. I also observed Robinson exit from the Ford Focus. Robinson was observed walking back to the driver's side of the Ford Focus, leaning into the car (the driver's door was open), and appearing to be having conversation with the other two occupants. As this was occurring, Ellard remained at the passenger side of the Ford Focus.

19. Shortly thereafter, **Robinson** walked over to the passenger side of the UCA's automobile with his right hand inside his jacket pocket. Robinson stated that "this shit is taking too long" and he pulled a plastic bag out of his jacket pocket and placed it on the front seat of the UCA's automobile. The UCA observed that the plastic bag contained a white rock-like

5

substance inside it.   The UCA handed $2,350 in cash to Robinson,
who walked back to the Ford Focus and opened the driver's side
door.   The substance purchased by the UCA was field-tested, with
a positive result for the presence of cocaine.

20.   As Robinson opened the driver's side door of the Ford
Focus, other DEA agents and I approached the Ford Focus to effect
an arrest.   Robinson began running away through the parking lot
toward the Southeast Expressway.   Ellard began running away in
the opposite direction.   Both **Robinson** and **Ellard** were pursued
and apprehended by other DEA agents and local police officers.
**Tucker** and **Barnes** were contained inside the Ford Focus and were
placed under arrest.   A DEA agent searched Robinson's person and
recovered from his pocket the buy money given to Robinson by the
UCA and a smaller quantity of crack cocaine and marijuana.   After
**Robinson** was advised of his constitutional rights, he was asked
if he wanted to answer any questions.   Robinson replied with
words to the effect that he was in trouble, that he would be
going to jail anyway, and that it did not matter what he said.
When Robinson was asked about the money recovered from his
person, he replied that "the white guy just gave it to me" (i.e.,
the UCA).

21.   As this was occurring, other agents and I approached
the Honda Civic and arrested **Hester**, who was still sitting in the
driver's seat.   I told Hester that he was being arrested for
conspiracy to distribute crack cocaine.   Hester immediately
responded that he did not know what I was talking about and that
he had driven there to pick up his sister, who works in the
Bickford's restaurant.   I knew that this was false as other
agents and I had observed Hester driving Ellard into the parking
lot to do the deal.   When I pointed toward Ellard and asked him
about his passenger, Hester replied that he did not know who that
was and that he had driven there alone.   A subsequent search of
the Honda Civic led to the recovery of a loaded Raven, Model MP-
25, .25 caliber semi-automatic pistol inside a white sock, which
was located in the pocket attached to the rear of the front
passenger seat.   I observed that the handgun has an obliterated
serial number.

22.   After the arrests, the Ford Focus was impounded and
moved to a separate location.   The hood of the Ford Focus was
opened and agents recovered two loaded firearms wrapped inside a
white t-shirt in the engine block on the driver's side of the
Ford Focus.   The firearms were (1) a loaded Ruger, Model P89,
nine-millimeter semi-automatic pistol, bearing serial number 315-
10946, and (2) a Lorcin nine-millimeter semi-automatic pistol,
bearing serial number L105037, loaded with hollow-point

ammunition, which had been reported stolen out of Newport, North
Carolina in November 2003.

23.   After **Robinson** was advised of his constitutional
rights, I also spoke with him in the parking lot.   I heard him
telling another agent that he did not know if the substance was
crack cocaine or sham cocaine.   When I asked Robinson his name,
Robinson replied that when he provided his name, "all the bells
and whistles will go off."   When I asked him why, he replied that
"I'm an ACC - just ask Campbell."   Robinson then explained that
"Campbell" was an ATF agent who was investigating Robinson.

24.   After **Ellard** was arrested, he was advised of his
constitutional rights and he agreed to speak with DEA agents.
Ellard admitted that he had been brokering the crack cocaine
deal, that he had been dealing with **Hester** to do the deal, that
he ordered 62 grams at a price of $1,950 so that he could sell
two ounces and retain six grams.   Ellard further stated that
**Hester** picked him up in his Honda in Dorchester and that they
were followed by the silver Ford to the location where the deal
was to take place.   Ellard further stated that, during the drive,
**Hester** stated that "the stuff" was in the other car and that he
told **Hester** that he was going to break off six grams for himself.

25.   Ellard stated that, after the UCA refused to give him
the money, he went back to the Honda and that **Hester** directed him
to go to the Ford Focus and speak with the back-seat passenger
**(Barnes)**.   Ellard stated that he went over to the Ford on two
occasions and spoke with **Barnes** about the fact that he had seen
the UCA's money and that the UCA would not release the money
without seeing the drugs.   Ellard stated that **Barnes** stated that
they were not going to give Ellard the drugs until they had the
money.   Ellard further stated that he spoke with **Robinson** about
breaking off six grams of the crack cocaine and giving it to
Ellard as his payment.   Ellard stated that he was speaking to all
three occupants of the Ford Focus and that, at one point, the
front-seat passenger **(Tucker)** stated to him, "I mean no
disrespect but this is getting fucked up."   Ellard further stated
that, right after **Tucker** made this statement, the driver
**(Robinson)** jumped out of the Ford and stated that "I'm gonna do
this shit myself."   Ellard stated that he did not want the driver
to do that because some of the money and some of the crack
cocaine was going to Ellard.   **Robinson**, however, reached under
the hood of the Ford and walked over to the UCA.

26.    After **Robinson** and **Barnes** were transported to the
Marshals Service this morning (April 13), Detective Sean Conners
of the Gloucester Police Department was standing in the cell
block area.   Detective Conners advised me that he heard **Robinson**
state to **Barnes** that "it's not crack anyway, it's only coke,
they'll see that when they test it at the lab."   **Robinson** then
looked at Detective Conners and stated, "that's right, I know
you're listening, motherfucker, it doesn't matter anyway."
**Robinson** then stated to **Barnes** that "when they came from
everywhere, I could of gone boom-boom."   I understand this
statement to be referring to **Robinson's** knowledge of and
proximity to the loaded firearms under the hood of the Ford Focus
and his possible use of one of the firearms.

### Conclusion

27.    Based on the foregoing, I believe that there is
probable cause to believe that, on or about April 12, 2004, Adam
Ellard, Willie Hester, Tavon Robinson, Steven Tucker, and Norman
Barnes conspired with each other to distribute cocaine base, also
known as "crack" cocaine, in violation of 21 U.S.C. § 846.

Steven C. Story
Special Agent, DEA

Sworn to and subscribed before me this 13th day of April
2004.

Marianne B. Bowler    USMJ
Marianne B. Bowler
Chief U.S. Magistrate Judge

8